The next matter on our calendar is NLRB versus Matsu Corp. And we'll hear first from Mark Fang. Good morning. May it please the court. Representing Matsu, the restaurant employer. The record is insufficient on the issue of on the health concern. The protected activity was challenging a 36-hour shift. There's just not enough evidence in the record regarding their so-called health issue. Well, you have the testimony of the employers who said they didn't want to work around the clock two days in a row. Did I have to show that they were going to get sick? Yeah. Well, first it was 36 hours. And you'll see in the record in the testimony of Ding and Zhang, continuously. Continuously working 36 hours. Continuously working 36 hours. They had some breaks. They had meal breaks and they had some rest breaks. But they couldn't go home. And then it became the 1 to 6 a.m. shift that was the problem. But that wasn't what they the 36 hours. We can't work continuously for 36 hours, whether with breaks or not. Then they switched to the 1 to 6 a.m. shift. What about the money that they were complaining they weren't getting that repaid? That's right. That's a very, very good point, Your Honor. And they betrayed their own. We're going to explore that one, too, because I want to know where the money is. Well, I want to when on cross-examination, the first employee, Ding, when he was asked, did you ever complain about this before? He said, and I quote, well, it was because in the past we got in these big orders. Since we had a deposit made, placed at a company, the boss promised us that they would. He would give us some reward from the restaurant's profits. And because of that, we would still work, even though we were very tired. So they betrayed their own position that this was a health issue. There's no case, I can't find a case, where you just say, I have a health problem. And then without elaborating any more than that, and then voila, you're into the 8A1 protection. Now, even in your own case, Marston, you declined to, you reject such a per se rule. The effect of the board's decision is to create a per se rule that employees may decide to leave work concertedly whenever they decide, whenever they decide there is something undesirable about working on a particular day. You rejected that. Are you challenging the ALJ's findings here? I'm fine. He made credibility findings. He accepted the testimony of the two employees. Are you challenging his findings and his credibility findings? I'm challenging the substantial, that there was, there was not substantial evidence on the protected activity. I'll also get into the motive. Why, why wasn't the testimony of the two employees substantial evidence? Because they were talking together and they've decided to do this together. Why is that not substantial? I don't, I don't challenge the concerted part at all. What I challenge is the health concern. And I don't even challenge that if they had at least put forth something more than just a mere utterance of that, there's a health concern. Is it okay? You don't think it was credible for them to say it's not healthy for us to be working all these hours continuously all night long? And sleeping on the dining room floor? Well, that's different. That's different. That's health. Well, because it's 36 hours. That's, is it a problem continuously working for 36 hours? Or is it the 1 to 6 a.m. shift? Why couldn't they, why couldn't they work the 1 to 6 a.m. shift, which was critical. And these, and it was critical for these employees to work. It was critical that day. And then take off from 10 to 6. They did it before. They did it for years before. It was only one in that. And they finally got tired of doing it because it wasn't good for their health. No, because with all due respect, your honor. Yes. It's in that passage that I just read in page 67 of the transcript where he says, things were okay. We were a little tired from it. But we got paid. We didn't get paid. Well, let's go see what the NLRA can afford us. It just seems like you're really going to, you're really putting the Marsden case undermining your holding in Marsden by allowing these workers to merely say, we had a health concern and that there they are with the 8A1 protection. Now it's different than the other cases where, okay, if they climb up, you know, there's a dangerous ladder. They have to climb up a 30 feet, you know, 30 feet, 30 foot silo or something. That's one of the NLRB cases and say, no, no, I'm not doing that. A little bit different than the situation here where there's no immediacy, no danger. I have not found any cases. It's been happening over time and they've just finally reached the end of their ropes. I mean, that's why is the ALJ and the board wrong on that? All of a sudden, and then coinciding with the fact that they, that with the payment issue, which they disclosed themselves, which they disclosed that's why they went to the Flushing Labor Center, Flushing Workers Center, just coinciding with that, that all of a sudden in September, it was a problem. Is that, I don't know if that was a coincidence. And remember, pay to play is seems a little odd to me from the get go. So I'm not sure they were shareholders, but I know that's not an issue here. But remember in Marsden as well, you said the AL, you pointed out that the ALJ mistakenly took the subjective perception of the workers wholesale, their discomfort in working conditions. Why in Marsden, you go at such great lengths to look at, to differentiate between what they claim the heavy rain and determining that it was drizzle. Why can't there be any facts here to, why can't you go through that analysis here? Well, you can't because there are no facts. There's nothing in the record regarding the health concern. It just seems very, very difficult. This would be a one of a kind case for you to accept this as protected activity, merely when they just said, blurted out health concern. Okay. Thank you. You've reserved three minutes for rebuttal. We'll hear from the NLRB. Thank you. Good morning. Good morning. May it please the court. My name is Brady Francisco Fitzmaurice. I represent the National Labor Relations Board. In this case, the board seeks enforcement of its order, finding that the company violated section 801 of the act when it discharged two of its employees, Mr. Ding and Mr. Jiang,  from work. In this case, I think a quick overview of the facts is helpful to understanding the health and safety concern that Mr. Feng attempts to undermine. Mr. Ding and Mr. Jiang typically work at the restaurant from open until close, five or six days a week. That's generally an 11-hour, 12-hour shift ending between 10 p.m. and midnight. In addition to those hours, Mr. Ding and Mr. Jiang were responsible for buying the restaurant's groceries in Queens before being transported to the restaurant in Connecticut, which they generally did around 8 a.m. In addition to those hours, whenever the company received a catering order, Mr. Ding and Mr. Jiang were asked to prepare those orders during overnight shifts scheduled in between their normal shifts, all of this having the effect of the workers left home in Queens early in the morning one day, worked to some extent continuously, but as your honors noted, you know, with certain breaks, not returning home until the following day, hopefully by midnight. The workers did do this for about 15 years without complaints, nearly 15 years, until they both got sick following an overnight shift in September of 2017. Is there information in the record about them being sick? Mr. Feng told us there's nothing there about their health. That's not the case, your honor. Each of the two employees gave testimony pertaining to their experiences in September. Each employee got sick and testified that they required a week to recover from that illness. Did they see doctors? The record doesn't reveal that information, your honor, but, you know, I think it's understandable that after working for 36 hours, they might feel sick. They were able to do it for 15 years, but on this occasion in September of 2017, they weren't. And the ALJ, the finder of fact, Judge Chu, heard their testimony and credited them, and I've heard no reason why that credibility determination should be overruled. Now, in September, after having that experience, the workers conferred with one another and decided, you know, we've been able to do this, but it's been too long. It's a problem and it's taking a toll on our health at this point. The next time that we're asked to work an overnight shift, we won't do it. How do you respond to the suggestion that it really wasn't a health concern, it was more about being owed some money? Sure. Well, the employees actually give testimony on this, which Mr. Fink points out, and they admitted that, yes, they were frustrated by the fact that they had been required to pay some money to their bosses as a condition of employment and that they hadn't gotten that money back. I mean, that frustration is understandable, but the fact is that they had this experience getting sick after working 36 hours, and there's nothing to show that they didn't get sick. They were credited on that fact, and that was the reason that they decided that in the future they would no longer work overnight shifts, although they would work their normal grilling schedules. A few months later, come December... Let me just pose a hypothetical, Mr. Francisco. If the ALJ had found that, in part, it was based on their concerns about their health, and we have all the data, if you will, the working hours backing that up, but it was also a concern or a protest over not being repaid money that they had somehow been forced to pay into this entity, would that be a problem for you? Or for the board? No, that wouldn't be a problem. There is case law, board law on the issue, that even where there are ancillary motivations, other concerns, the board is able to look at a health concern, and if it is legitimate, that will pull their concerted activity under the protections of Section 7. I'd point, Your Honor, to McGaugh Labs, which is cited in our brief, in which the board said that even if an employee had a, quote, personal problem with management, because there was a legitimate health and safety concern, Section 7's protections were invoked. So the financial dispute is really a non-issue here. The health issue was legitimate and was the reason that the employees decided to withhold their labor during that overnight shift. Also, notably, in December, when they learned of the overnight shift, a week before the shift was to be worked, they informed, almost as soon as they were alerted to the catering order, they informed management that, no, we're not doing this. This was not, you know, a moment, a walkout that happened at the spur of the moment. The employees informed management, management asked them again, you know, please, would you do the shift, and the workers held firm on their agreement, you know, to no longer work the overnight shift. They informed that to Manager Lin, who relayed their concern to the owners. You know, in their brief, the company tries to call into question whether this was aimed at some sort of, you know, whether the employee's action was actually aimed at affecting terms and conditions of employment. Their reference to the Marsden case, which they seem to be relying strongly here in argument, is shown to be flawed right on this issue. I mean, the issue in Marsden was that the employees there were taking action that was not directed towards participating in the setting of terms and conditions of employment. Here, it clearly was. You know, Manager Lin took the employee's concerns related to ownership and told the owners, employees are concerned that the long hours are taking a toll on their health, and that's the reason that they're not going to be working this overnight shift. So, Marsden really is not problematic. Notably, the company's abandoned its original defense that it brought before the board, which was that these employees were not fired at all, that they voluntarily quit. You know, that's the record that the company developed and the arguments that the company developed before the board. The board rejected it, finding that these employees were told to stay home and rest and don't come back to work if your health is affecting you, and when the employees repeatedly followed up and asked the company, when can we come back to work, they were not invited back. On these facts, the company found that this is a discharge. You know, for good reason, the company's abandoned that defense on appeal, and the defenses that the company presents now, for the most part, were not presented to the board and shouldn't even really be considered. But, you know, for the reasons that we've already discussed, they hold no water. Hearing no other questions, I'll wrap up that, you know, substantial evidence supports the board's finding that the company unlawfully discharged Mr. Ding and Mr. Jiang. Let me, I have a question. You know, on the restaurant's out of business, I mean, what happens now? Sure, good question. I don't know whether the restaurant is operational or not. I've heard through their attorneys that they closed in around November, and, you know, I'll take the attorney's other word on that. So the way board proceedings happen is that there's a bifurcated proceeding, the liability phase has already happened, the record is developed to determine whether the company is liable for their unfair labor practices. And next, there will be a compliance proceeding, you know, should this court enforce the order as we're requesting, during which the board defined the exact contours of what compliance with the court's order would look like. This is a judicially approved bifurcated procedure that's been in place for years. You know, if, in fact, the company is able to prove at that proceeding that it's permanently closed, you know, that it's not operating another restaurant, the same restaurant under a different name, then, of course, you know, reinstatement would not be possible, and that's fine. But the record as it stands today is devoid of those facts. We don't know if reinstatement is possible or not. Thank you. You're welcome. Thank you, counsel. Thank you very much. Mr. Fang, you reserved three minutes for rebuttal. Maybe you could tell us about the restaurant. Is it still in business? Unmute. Unmute her. Sorry about that, Your Honors. The restaurant's now closed. It's closed. So the only part that I question is the signage. You can't put signage on a closed restaurant. So that's what I was getting at, at the third point. Have the owners opened a different restaurant with a different name? No, I don't believe so. What have they done with the employees' money? Well, that's part of a contract dispute that played out in federal district court that this case actually was supposed to be wrapped up in on a settlement. There's now a judgment for some $200,000 in Connecticut District Court against one of the owners and a lien on his house. They're covered, at least with a lien. So that was rectified. How much equity in the house? Over that. I can't be sure, but over the $200,000. But I really want to get back to here. Judges, this was only once every four months. The last time was September, and then it was December. So that's an important fact. And I also want to point out, the other employee, Jang, said when he was trying to bargain back so that he could work normal working hours and kind of have it both ways and just not work the 1 to 6 a.m. because he knew that's where it would really hurt them. He said, and I told her that we only had minor issues with our bodies. We cannot work on a 36-hour shift, which was super hard, but we could still do the normal daily work. They're trying to have it both ways. And you rejected that in GAIU, which I submit is still the point that rejecting overtime is an unprotected partial work stoppage also applies to this case. I'm not trying to hold up an investment dispute in competing with their health concern. The problem is their health concern is completely, the record is completely barren. And I just don't see how you can accept that just on, without even then describing how they were sick, what it was. You know, it just doesn't square with what you stated in Marsden, which I say again. So flesh out that a little bit for me, please. What should have been there in order to satisfy what you say was their burden to prove that they had health problems? Okay, well, exactly like Justice Pooler stated, how about describing how they get sick, what the problem is with their overtime, working the late night shift, or how about just sticking with the overnight versus the long hours versus the one to 6 a.m. shift? Or how about seeking a doctor? None of that in the record, completely devoid in the record. So all you have left is, well, these other, you have they're just uttering the word, we have a health issue. And then you have these sprinklings of inconsistencies regarding it, where they betray what really is going on here. So what should we do with this? Remand and have them, have the board remanded to the ALJ for further fact finding on what their health issues were? I think that would be appropriate, Your Honor, to flesh out what the health concerns, if there is. And if they're able to establish it on the record, at least you wouldn't have one case sticking out there from the U.S. Court of Appeals, where you really just need to say, I have a health concern, and you're off the hook, and you have the MRA protections. But, but there is certainly, to my mind, at least information that back in the record, sorry, testimony that backs up why it would be logical to conclude that there was a health concern. I mean, the hours that were kept sleeping on the dining room floor. I mean, I've slept on floors, you've probably slept on floors, but it's, you know, to do this as a part of an employment arrangement. This was not every day. The last time this occurred was in September. I know it's not every day, but should any worker have to put up with that? Well, then it wasn't the long term hours, then they go back to, well, it's really the 1 to 6am shift. How about saying, can we get the afternoon off instead of the 1 to 6am? You know, we'll do the 1 to 6am shift, but how about if you let us have the afternoon off the following day? There's nothing. But wouldn't it be easier?  That's all right. Wouldn't it be, wouldn't it be, wouldn't it make this case? And wouldn't it be great if we went back to the trial attorneys so that they know that they can't just have their witnesses say, you know, utter, I have a safety, I have a safety concern, or I have a health concern. There's no case like that. I haven't seen it. They haven't. And even in their brief, the NLRB's brief, they come back and say it's obvious. It's common sense. They have to resort to that. And then they say it's a safety concern. I did a search of the record. Safety never appears in the record at all. So that's all of a sudden, it's a safety concern. I can understand if it's a safety concern. If you're like one of the cases, you got to climb up this or Washington aluminum, Washington NLRB versus Washington aluminum, where it's the coldest day of the year in Baltimore. You can't get into any of that. What about handling sharp knives when you're exhausted? I would bet that if I did it, if I did a search of the record, there's nothing about sharp knives in the record. And that would be great. That would be great if they elicited that. But what does that have? Could we take judicial notice of the fact that sharp knives are used in the preparation of food? Not in this case, because you know why? They weren't sushi chefs. So at least not if it's sushi knives, because they were hot pot food chefs. Oh, even better. Handling hot pots when you're about to fall into them because you're tired. Thank you, counsel. Okay, thank you, your honors. Thank you both. Full reserve decision. Thank you.